
FILED

NOV 7 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

DENA LINDSAY-FELTON,

      Plaintiff,

v.                           Civil No. 2:17cv559

FQSR, LLC, d/b/a KBP FOODS,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by defendant FQSR, LCC, d/b/a KBP Foods, ("Defendant," or "KBP"). ECF No. 31. After examining the briefs and record, the Court finds that oral argument is unnecessary because the facts and legal contentions are adequately presented, and oral argument would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J). For the reasons set forth below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

### I. Background

Plaintiff, Dena Lindsay-Felton ("Plaintiff") is a former KBP employee/store-manager who resigned from her employment on September 20, 2016, based on what she characterizes as a hostile work environment and discrimination based on her race (African-American). During the period immediately prior to her resignation, Plaintiff was a manager of a KBP restaurant, and her supervisor,

Susheel "Shue" Kumar ("Shue"), was a KBP "Area Coach" responsible for overseeing multiple restaurant locations. During her deposition, Plaintiff testified that her relationship with Shue began to break down during the last several months of her employment, beginning with a disagreement over inventory numbers because Plaintiff would not falsify records as Shue purportedly directed. From that point forward, Shue repeatedly yelled at Plaintiff, demeaned her in front of her store employees, pointed his finger in her face on at least one occasion, and engaged in other harassment that Plaintiff asserts ultimately caused her to resign. Shue also engaged in behavior that Plaintiff asserts demonstrates a link between her race and Shue's harassment. Now at issue on summary judgment are Plaintiff's race-based hostile work environment claim, constructive discharge claim, and retaliation claim advanced under Title VII of the Civil Rights Act of 1964.

## II. Standard of Review

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

2

there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012) (citation omitted). "Because 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "'sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 255, 251-52). In making such determination, "the district court must 'view the evidence in the light most favorable to the' nonmoving party." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Tolan v. Cotton, 572 U.S. 650, 657 (2014)).

## III. Discussion

A review of Defendant's filings and exhibits, as well as Plaintiff's opposition brief and exhibits, demonstrates the validity behind Defendant's assertions that: (1) Plaintiff does not challenge the vast majority of the facts contained in Defendant's statement of "Undisputed Facts"; and (2) Plaintiff's opposition brief relies on citations to deposition excerpts that were not provided to the Court, thus requiring the Court to disregard the bulk of Plaintiff's supplemental factual allegations because they lack evidentiary support. That said, the Court disagrees with Defendant's characterization of affidavits submitted by Plaintiff as being based solely on inadmissible hearsay rather than on first-hand knowledge.[1] The Court also notes that, when construed in Plaintiff's favor, the transcript excerpts from Plaintiff's own deposition that are before the Court lend support to Plaintiff's hostile work environment claim.

### A. Hostile Work Environment

Considering first Plaintiff's hostile work environment claim, "[o]rdinarily, to prove a hostile work environment claim under Title VII, a plaintiff must show (1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is

---

[1] Defendant does not present any deposition testimony from such individuals, nor any other evidence, suggesting that the affiants lack first-hand knowledge to support their key factual allegations. Rather, Defendant seeks to characterize the language used in the affidavits in Defendant's favor.

sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 328 (4th Cir. 2018) (internal quotation marks and citations omitted).[2] Here, the primary issue raised by Defendant on summary judgment challenges the second element, although Defendant offers some argument challenging the third element.

As explained by the Fourth Circuit earlier this year:

> The second element of a hostile environment claim requires that the offending conduct be based on the employee's "race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2; see Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc). In other words, "Title VII does not prohibit all verbal or physical harassment in the workplace"—it is directed only at actions that occur "because of" one of the protected statuses. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions. See id.

Id. at 329. Here, the following race-based facts and/or contextual facts are contained in the summary judgment record:

> (1) Sometime near the end of her employment, Plaintiff overheard her supervisor (Shue) speaking with three potential new employees, and when Shue discovered that one of the applicants forgot his ID, Shue "pointed his

---

[2] Strothers was not itself a "hostile work environment" case, but in the context of reviewing the validity of the plaintiff's Title VII retaliation claim, the Fourth Circuit provided a detailed analysis on the hostile work environment standard as applied in this Circuit.

5

fingers at the guys and said, that's why you niggers[3] will never be nothing, will never amount to nothing. Who doesn't have - - who doesn't have ID on them?"   Pl. Depo. Tr. 74, ECF No. 32-1.   When Plaintiff recounted this same incident at a different point in her deposition, she said that Shue's statement to the applicants was that they were "**stupid** n****rs."   Id. at 84 (emphasis added).

(2) After Shue began harassing Plaintiff during the last several months of her employment, it was "**[a]lmost every single day** that [Shue] made his rounds in [Plaintiff's] store" that he referred to Plaintiff as "**stupid**" or "dumb" rather than using her name.   Id. at 68 (emphasis added).

(3) Shue never let Plaintiff offer her opinion even though she was a store manager, and he repeatedly degraded her at work, with Shue on at least one occasion yelling at her while pointing his finger in her face in a threatening manner.   Id. at 68, 71, 73, 98, 131, 188.

(4) Although Plaintiff never personally heard Shue use the n-word other than to the three applicants, she had been told by other employees that Shue had used such racially offensive term on other occasions.[4]   Id. at 78.

(5) Shue used the term "cockroaches" to refer to employees at Plaintiff's store, and all of Plaintiff's employees were African-American except for one Caucasian.   Plaintiff interpreted the word "cockroach" to be a derogatory racial term, with Shue at one point telling Plaintiff: "[A]ll you have is cockroaches in the

---

[3] The Court regrets the need to reproduce such viscerally offensive word in this written opinion.   However, having reviewed several other similar hostile work environment cases, and considering the fact that legal research often relies on word searches similar to a Google search, the Court believes that one direct quote, without redaction, is necessary.

[4] To the extent Defendant challenges the admissibility of such "hearsay statement," the Court notes that there are both "subjective and objective components" to the hostile work environment analysis, and the subjective component requires the plaintiff to perceive the environment as "hostile or abusive."   Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011). Accordingly, the purported hearsay comments of other employees may be admissible not for their truth, but to demonstrate Plaintiff's subjective reaction when trying herself to understand why Shue was treating her so poorly in the workplace.

store. Get rid of some of these cockroaches." <u>Id.</u> at 71-72, 174.

(6) Plaintiff believed that Shue didn't like her both because she was black and because she was a woman, and while Plaintiff does not advance a sex-based discrimination claim, her sworn testimony establishes (for summary judgment purposes) that Shue "told [her] **consistently** that women of – **of [her] culture** . . . were beneath him." <u>Id.</u> at 174-75 (emphasis added).

(7) As set forth in a sworn declaration from Carlton Davis, an individual that previously worked with Plaintiff and Shue: "In 2015, Mr. Shu[e] made comments to African-American employees and often referred to them as 'n****rs' and 'cockroaches.'" ECF No. 36-1.[5]

(8) As set forth in a sworn declaration from Nasheda Foreman, an individual that previously worked with Plaintiff and Shue: "I often heard Mr. Shu[e] Kumar make racially derogatory comments to African-American employees. On several occasions, Mr. Kumar stated, 'These n****rs don't know what they are doing.' Others . . . witnessed these comments and Mr. Kumar made racially derogatory comments often." ECF No. 36-2.[6]

---

[5] Mr. Davis' declaration expressly states that he has "personal knowledge" of the facts set forth therein. ECF No. 36-1. Moreover, contrary to Defendant's arguments in its reply brief, the existence of such affidavit plainly bolsters Plaintiff's case even if she was not personally aware of the referenced <u>additional</u> racial slurs because such acts provide a <u>direct link</u> between Shue's mistreatment of KBP subordinates and their race. Defendant incorrectly cites <u>King v. McMillan</u>, 594 F.3d 301 (4th Cir. 2010) for the proposition that such testimony is inadmissible. However, <u>King</u> expressly states that "[t]estimony from other employees describing their own experiences of harassment by the defendant is often relevant to a plaintiff's hostile work environment claim," thereafter recognizing that even if the plaintiff lacked knowledge of such events during the course of his or her employment, such evidence <u>remains relevant</u> to the second element of the hostile work environment test. <u>Id.</u> at 310

[6] Ms. Foreman's declaration expressly states that she has "personal knowledge" of the facts set forth therein. ECF No. 36-2. Moreover, as with Mr. Davis' affidavit, Ms. Foreman's affidavit plainly bolsters Plaintiff's efforts to link Shue's unwelcomed conduct with Plaintiff's race.

Considering such evidence in a light most favorable to Plaintiff, the Court finds that there is sufficient evidence in the record for a reasonable juror to conclude that Shue's mistreatment of Plaintiff occurred as a result of her race.

First, as the Fourth Circuit has recognized on multiple occasions, "the use of the word 'n[****]r' is pure anathema to African-Americans, as it is to all of us" and such word "is the kind of insult that can create an abusive working environment in an instant" as it is "degrading and humiliating in the extreme." Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015) (internal citations and quotation marks omitted); see Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) ("As other courts have observed, perhaps no single act can more quickly alter the conditions of employment than the use of an unambiguously racial epithet such as 'n[****]r' by a supervisor.") (internal quotation marks and citations omitted); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 280 (4th Cir. 2015) (en banc) ("'[I]n my view, being called the n-word by a supervisor—as [the plaintiff] alleges happened to him—suffices by itself to establish a racially hostile work environment." (quoting Ayissi-Etoh, 712 F.3d at 580 (Kavenaugh, J., concurring))). While Shue's alleged use of such toxic term was not directed at Plaintiff, it was used in the workplace and in Plaintiff's presence. Additionally, the context of Shue's use of such degrading term involved referencing

8

workplace conduct of individuals subordinate to Shue, as contrasted with its use while telling a crude joke or in the course of recounting someone else's prior statement. Moreover, the speaker was an area manager who was superior to all other employees in the store, including Plaintiff. When considered in conjunction with Mr. Davis' and Ms. Foreman's declarations, the record demonstrates that Shue's use of such term to reference workplace conduct of subordinate African-American employees was not an isolated incident. Finally, as set forth in both Plaintiff's deposition and Ms. Foreman's affidavit, the context of Shue's use of such word is sufficient to support a reasonable juror in concluding that Shue repeatedly voiced his racist belief that there is a link between African Americans and stupidity. Cf. Savage v. Maryland, 896 F.3d 260, 277 (4th Cir. 2018) (noting that when racial slurs are used repeatedly to insult African-American "employees and customers," such slurs can create "an unlawful hostile work environment" even if they are "not directed specifically at the complaining employee").

While a single use of the n-word in the workplace directed at someone other than the complainant is likely insufficient to establish a race-based hostile work environment, here, Plaintiff has presented evidence illustrating more than a single incident. Moreover, Plaintiff's efforts to link the "unwelcome conduct" to her race do not rely solely on Shue's use of the n-word, instead

9

highlighting Shue's repeated workplace statements referring to Plaintiff's employees (all but one of whom were African-American) as "cockroaches." Furthermore, Plaintiff's evidence on the use of this term goes beyond her own sworn statement, as another employee similarly attests that Shue directed such term at African-American employees. Accordingly, when coupled with Shue's use of the n-word and other relevant evidence, such additional statements bolster Plaintiff's contention that Shue's ongoing mistreatment of her was motivated by her race.

Second, in addition to the racial slurs, Plaintiff's evidence is subject to being reasonably interpreted as demonstrating that Shue went a step further by directly injecting Plaintiff's race into the equation by "consistently" explaining to Plaintiff that women of her culture were "beneath him." Cf. Strothers, 895 F.3d at 330. In line with his expressly stated belief, for several months near the end of Plaintiff's employment, Shue consistently treated Plaintiff as if she was, in fact, "beneath him." Pl. Depo. Tr. 174-75.[7] Furthermore, when the relevant facts are construed

---

[7] The Court rejects Defendant's invitation to interpret the excerpts from Plaintiff's deposition that are in evidence in a manner that favors Defendant. For example, the fact that Plaintiff stated in her deposition that she had one Caucasian employee working at her store does not establish that Shue's "cockroach" comments were addressed collectively at employees of multiple races as there is no evidence that the lone Caucasian store-employee was even present when Shue made such comments. Similarly, Defendant's efforts to explain away Shue's comments, that women of Plaintiff's culture were "beneath him," require a parsing of words in a manner that favors Defendant, which is simply not proper when evaluating Defendant's motion for summary judgment. On such latter point, Defendant

10

in Plaintiff's favor, Shue's workplace statements can be interpreted as evidencing his racist belief that African-Americans are stupid, and he similarly called Plaintiff stupid or dumb at nearly every opportunity near the end of her employment. To the extent that questions exist as to whether Shue could have harassed Plaintiff simply because she was his subordinate (i.e., he mistreated everyone that worked for him), or simply because she was a woman (i.e., he mistreated all women that worked for him), determining his motivation is a question for the jury in light of all the relevant facts and circumstances, which include evidence of racial animosity.[8]

In sum, because the record reasonably supports a finding that there were multiple instances of race-based harassment during the relevant timeframe, directed by a manager of multiple stores at both Plaintiff and her primarily African-American workforce, the

also relies on a page of Plaintiff's deposition (page 176) that Defendant did not present to the Court.  ECF No. 32-1.

[8] To the extent Defendant points to additional undisputed facts demonstrating that Shue held out another African-American employee (Mr. Davis) as a model for Plaintiff to emulate, such competing fact is a matter for the jury to weigh, as it is insufficient at the summary judgment stage to undercut the evidence favorable to Plaintiff, particularly when considering Plaintiff's theory that Shue's offensive behavior resulted from the fact that Plaintiff was an African-American subordinate that refused to "stay in her place." The fact that Shue previously promoted Plaintiff to store manager is another similar fact that favors Defendant; however, the current record fails to establish how many applicants/candidates there were for such job and/or the ethnicity of such applicants/candidates.  To the extent that the workforce at the KBP location where Plaintiff was working prior to her promotion was similarly dominated by African-American employees, Plaintiff's earlier-in-time promotion could ultimately prove irrelevant to the calculus.

11

Court rejects Defendant's contention that no reasonable juror could find that Plaintiff was subjected to severe and pervasive harassment as a result of her race. See Boyer-Liberto, 786 F.3d at 280 (discussing the fact that: (1) "harassment perpetrated by a supervisor against her subordinate" typically has a "particular threatening character";[9] and (2) that a reasonable jury could find that a hostile work environment existed based on a single incident if it was sufficiently severe). Importantly, the jury will not be limited to considering only what it determines to be overtly racial comments, but also will be able to consider Shue's acts of ongoing harassment that the jury believes were motivated by the fact that Plaintiff is African-American. Id. at 281 n.4; see Gilliam v. S.C. Dep't Of Juvenile Justice, 474 F.3d 134, 142-43 (4th Cir. 2007) (affirming summary judgment in the defendant's favor because harassing behavior by a supervisor is not actionable under Title VII unless it was motivated by the plaintiff's race, and the record in that case critically lacked "some independent evidence of racial animosity").

To the extent it is not sufficiently addressed above, the Court expressly rejects Defendant's limited challenge to Plaintiff's ability to demonstrate the third-element of her

---

[9] Here, not only was Shue Plaintiff's supervisor, but Plaintiff's facts indicate that Shue expressly told Plaintiff that company management would always believe his word over hers in the event of a dispute, thus illustrating the leverage he exerted over Plaintiff.

hostile work environment claim, which "requires that the offending conduct be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Strothers, 895 F.3d at 331 (internal quotation marks and citation omitted). Such element has "both a subjective and objective component," with the subjective component plainly satisfied in this case when the evidence is viewed in Plaintiff's favor (to include the fact that Plaintiff's resignation was effective immediately and expressly linked to Shue's on-the-job harassment). "In assessing whether harassment is objectively abusive, courts must examine the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotation marks and citations omitted).

Here, the summary judgment record demonstrates that Shue's mistreatment of Plaintiff was ongoing over the course of several months and occurred every time he was in her store, that his behavior was physically threatening on more than one occasion,[10] that he humiliated and undercut her in front of her own store

_____

[10] Construed in Plaintiff's favor, the record evidence illustrates that Shue got too close to Plaintiff in a threatening manner on multiple occasions. See Pl. Depo. Tr. at 71 (indicating that Shue used threatening body language "all the time").

13

employees that she was responsible for managing on a daily basis (thereby impacting her ability to perform her job), and that he refused to listen to her feedback notwithstanding her managerial position, instead repeatedly calling her stupid and attempting to bully her into falsifying inventory numbers so that he could secure a larger bonus. See id. at 332 ("Heightened scrutiny, unfair evaluations, and arbitrary dress codes are likely to make a job more difficult and trigger responses from workers who feel compelled to protest their treatment, which may further interfere with their work."). Additionally, Shue repeatedly told Plaintiff that her culture played a part in her being "beneath him" and used the n-word in her presence when chastising African-American job applicants for conduct associated with their prospective employment. See Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011) (explaining that the "totality of the circumstances" inquiry applicable to the third prong of the hostile work environment claim "includes conduct directed not at the plaintiff" because it turns on "the nature of the [entire] workplace environment," as contrasted with the "individual dynamic" between the plaintiff and the alleged harasser) (quotation marks and citations omitted). Shue's actions, viewed collectively and in a light most favorable to Plaintiff, are sufficient for a reasonable juror to conclude that the "net effect . . . was an abusive environment likely to 'detract from employees'

14

job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.'" Strothers, 895 F.3d at 331 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). For all of these reasons, Defendant's summary judgment motion is denied as to Plaintiff's hostile work environment claim.

## B. Constructive Discharge and Retaliation

Turning next to Defendant's challenges to Plaintiff's claims asserting that she was constructively discharged due to her race and/or retaliated against by Defendant, Defendant argues that both claims fail based on the absence of evidence demonstrating an "adverse employment action," to include an adverse employment action in the form of a "constructive discharge." In response, Plaintiff focuses on establishing that her theory of "constructive discharge" supports the validity of both her constructive discharge claim and her retaliation claim.

### 1. Constructive Discharge

Plaintiff's constructive discharge claim turns on "whether there is sufficient evidence demonstrating that, as a result of [Shue]'s discriminatory conduct, [Plaintiff] was subjected to circumstances 'so intolerable that a reasonable person would resign.'" U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131, 144-45 (4th Cir. 2017) (quoting Green v. Brennan, 136 S. Ct. 1769, 1779 (2016)). The intolerability standard requires "objective intolerability," but the controlling

legal test no longer requires a plaintiff to demonstrate that the defendant had a "subjective intent to force a resignation." Id. As recently explained by the Fourth Circuit:

> Although hostile work environment claims are assessed under a "severe and pervasive" standard, constructive discharge claims are evaluated under an objective "intolerability" standard . . . . The "intolerability" standard governing constructive discharge claims is more stringent than the "severe and pervasive" standard for hostile work environment claims. See Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995) (explaining that hostile work environment claims require "less severe" conditions vis-á-vis the intolerable conditions necessary for constructive discharge claims)
> . . . .

Nnadozie v. Genesis HealthCare Corp., 730 F. App'x 151, 162 (4th Cir. 2018). Accordingly, "[c]onstructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." Tawwaab v. Virginia Linen Serv., Inc., 729 F. Supp. 2d 757, 783 (D. Md. 2010) (internal quotation marks and citation omitted). It is well-established in this Circuit that mere "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Stennis v. Bowie State Univ., 716 F. App'x 164, 167 (4th Cir. 2017) (emphasis added) (quoting Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 (4th Cir. 2004)).

16

Applying such higher standard to the case-specific record before the Court, no reasonable juror could conclude that Shue's alleged race-based harassment rose to the level of "intolerability" necessary to compel a reasonable person to resign. Plaintiff's evidence fails to demonstrate how often Shue came to her store and belittled her, or how long he stayed at her store when he did visit, and she relies primarily on Shue yelling at her and repeatedly calling her stupid or dumb during the last several months of her employment. See Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (finding that allegations that the plaintiff's supervisors "yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back . . . do not establish the objectively intolerable working conditions necessary to prove a constructive discharge"). Plaintiff's deposition testimony, if credited by the factfinder, certainly reveals that Shue's visits to Plaintiff's store involved hostile and unjustified criticism and insults, coupled with instances directly or indirectly linking such treatment to Plaintiff's race; however, such alleged mistreatment is insufficient to establish "intolerability" of working conditions such that Shue's treatment of Plaintiff should be viewed by the law as the functional equivalent of termination. Stated differently, although the Court finds that Boyer-Liberto and

Strothers both support the viability of Plaintiff's hostile work environment claim, such finding was a close call on this record, and even when all record evidence is construed in Plaintiff's favor, a reasonable juror could not conclude that Plaintiff can also clear the elevated bar necessary to establish constructive discharge. See Tawwaab, 729 F. Supp. 2d at 783-84 ("[The Plaintiff] is only able to state the minimum required to sustain his hostile work environment claim, and thus has insufficient evidence that he was subjected to a truly intolerable work environment that would leave a reasonable person with no choice but to resign. [The Plaintiff's] allegations that [his direct supervisor] called him race-neutral names, inconvenienced and undermined him in front of his superiors, and used sporadic racial epithets, even if true, are insufficient to establish intolerable conditions."). Notably, even in describing her final conversation with Shue that caused Plaintiff to resign, Plaintiff does not describe any overtly racial comments or Shue threatening her, but rather, she provides another example of Shue calling her stupid and telling her that she should listen to him and do whatever he says. Pl. Depo. Tr. 97-99. In sum, Plaintiff's constructive discharge claim fails as a matter of law.

## 2. Retaliation

As to Plaintiff's retaliation claim, Plaintiff asserts that she was retaliated against after complaining to company management

18

about Shue's use of the n-word.   To establish a prima facie

retaliation claim under Title VII, a plaintiff must demonstrate

"(1) she engaged in a protected activity; (2) the employer acted

adversely against her; and (3) there was a causal connection

between the protected activity and the asserted adverse action."

Strothers, 895 F.3d at 327 (quotation marks and citation omitted).

    Assuming that Plaintiff "engaged in a protected activity"

either  by  personally  reporting  Shue's  conduct  to  company

management, or by convincing another employee to lodge an anonymous

"hotline" complaint, Plaintiff's summary judgment brief appears to

rely  on  her  "constructive  discharge"  to  prove  the  requisite

"adverse action."   To the extent Plaintiff elects to prove an

"adverse action" through a theory of constructive discharge,[11] her

retaliation claim fails for the same reasons discussed immediately

above.   In short, Plaintiff fails to present sufficient evidence

---

[11] It is unclear whether Plaintiff seeks to rely on constructive discharge
due to her belief that proving an "adverse employment action" is a necessary
element of her retaliation claim, or whether she proceeds under such theory
because, based on the facts, it is her only viable option.   Compare Boyer-
Liberto, 786 F.3d at 281 (en banc) (listing the second element of a Title
VII retaliation claim as requiring that the employer "took an adverse
employment action against" the plaintiff) (emphasis added), with Strothers,
895 F.3d at 327 n.3 (clarifying that the second element of a retaliation
claim was apparently misstated in Boyer-Liberto in light of the Supreme
Court's earlier-in-time opinion in Burlington N. & Santa Fe Ry. Co. v.
White, 548 U.S. 53 (2006) as Burlington Northern rejected the "adverse
employment action" requirement in favor of a less onerous "adverse action"
requirement that "need not be employment-or workplace-related in order to
sustain a retaliation claim"), and Lettieri v. Equant Inc., 478 F.3d 640,
650 n.2 (4th Cir. 2007) (explaining that, in Burlington Northern, "the
Supreme Court rejected our circuit's formulation of the second element of
the prima facie case").

19

for a reasonable juror to conclude that she was constructively discharged based on intolerable working conditions.

Alternatively, to the extent that Plaintiff's summary judgment position is subject to being construed as arguing that Shue's harassment itself constituted the requisite "adverse action," even if it did not rise to the level of an "adverse employment action," Strothers, 895 F.3d at 327 n.3 (emphasis added), this Court would find that no reasonable juror could render a verdict in Plaintiff's favor on this record. The Supreme Court has defined the contours of the necessary "adverse action" as requiring "that a reasonable employee would have found the challenged action materially adverse," meaning that the employer's reaction to the protected conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Here, Plaintiff fails to point to any evidence of retaliatory acts taken by Shue after she complained to management. Accordingly, critically absent from Plaintiff's evidence is any fact on which a reasonable juror could conclude that there was a causal connection between Plaintiff's involvement in reporting Shue to company management and Shue's treatment of Plaintiff. See Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216-17 (4th Cir. 2016) (discussing the fact that a retaliation claim

20

requires more demanding proof of causation as compared to a "status-based discrimination claim"). Plaintiff fails to present evidence on which a reasonable juror could conclude: (1) that Shue was aware that Plaintiff was the person that complained to company management about his use of the n-word, Strothers, 895 F.3d at 336 ("[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity."); and (2) more importantly, even assuming in Plaintiff's favor that Shue possessed sufficient information to surmise that Plaintiff was behind the report to management, Plaintiff does not allege any facts suggesting that Shue increased the severity of his harassment after such report was made. Rather, a review of the portions of Plaintiff's deposition that are before the Court suggests that Shue continued to mistreat Plaintiff in the same way as he had been for several months—i.e., the alleged hostile environment simply continued. See, e.g., Pl. Depo. at 68 (indicating that after the multi-month dispute between Plaintiff and Shue began, Shue spoke to her in an inappropriate manner "almost every single [time]" that he "made his rounds" to her store, with Shue calling her stupid and dumb and getting too close to her person in a threatening manner); id. at 72 (indicating that Plaintiff recalled Shue calling the store employees "cockroaches" closer in time to when their dispute began than the time she resigned, with her resignation occurring only weeks after the n-

word incident). While Plaintiff does not have a clear recollection of exact dates, Defendant's unobjected to statement of "Undisputed Facts," which is supported by citations to various exhibits, establishes that the n-word incident occurred and was reported sometime around September 9, 2016, with Plaintiff resigning less than two-weeks later. As to Shue's conduct during the final weeks of her employment, the following exchange occurred at Plaintiff's deposition:

Q. What happened between September 6th and September 20th that you consider to be mental abuse?
A. The screaming, the yelling, cussing, finger-pointing in my face. He approached me in an intimidating manner. Never been called out of my name. N****r, stupid, or dumb.
Q. Did he ever call you the "N" word?
A. No.
Q. Is all of this that you just said: screaming, yelling, cussing, finger-pointing in your face, all took place between the time that Rusty came out to visit and talked to you and Shemekia about the Hotline complaint and your resignation?
A. It was happening before that, ma'am.
Q. But was it happening after as well?
A. Yes.

Pl. Depo. Tr. 188 (emphasis added). In sum, Plaintiff's allegations fall short of the showing necessary for a reasonable juror to conclude that Plaintiff was retaliated against as a result of reporting Shue to management and/or that any changes in Shue's conduct, post-report, rose to the level that would dissuade an employee from making such report in the first place. For these reasons, Plaintiff's retaliation claim fails regardless of whether

it is predicated on a theory of "constructive discharge" or a theory of "adverse action" in the form of increased harassment.

## IV. Conclusion

For the reasons set forth in detail above, when the totality of the relevant events are considered together and construed in Plaintiff's favor, Plaintiff's evidence is sufficient for a reasonable juror to conclude that Plaintiff was subjected to "severe and pervasive" harassment over the course of several months as a result of her race based on the conduct of her management-level immediate supervisor. While a reasonable jury could ultimately determine that Shue's comments about Plaintiff's "culture" and use of the term "cockroach" are matters untethered to Plaintiff's race, it could also conclude the contrary, particularly if it credits the evidence regarding Shue's repeated use of the n-word in the workplace. As a result, the record demonstrates "sufficient disagreement" regarding critical facts so as to require submission of the hostile work environment claim to a jury as the evidence is not "so one-sided that [Defendant] must prevail as a matter of law." McAirlaids, Inc, 756 F.3d at 310. [12]

---

[12] The Court has considered the supplemental out-of-circuit district court case submitted by Defendant. ECF No. 43. However, consideration of such case does not alter this Court's conclusion in light of the case-specific record and the Fourth Circuit's en banc opinion in Boyer-Liberto and more recent panel decision in Strothers.

23

Defendant's summary judgment motion is therefore **DENIED** as to Plaintiff's hostile work environment claim.

In contrast, Defendant's summary judgment motion is **GRANTED** as to Plaintiff's claims that she was constructively discharged due to her race and/or retaliated against as a result of protected behavior. The record evidence is insufficient as a matter of law to demonstrate that Plaintiff's working conditions were "intolerable," and/or that there was a causal link between Shue's harassment of Plaintiff and her involvement in reporting his earlier-in-time use of a racial epithet.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____/s/ Mark S. Davis
Mark S. Davis
United States District Judge

Norfolk, Virginia
November __7__, 2018